# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | WILLIAM T. HART | SITTING JUDGE IF OTHER THAN ASSIGNED JUDGE | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 4573 | **DATE** | SEPT. 19 , 2003 |
| **CASE TITLE** | SPHERE DRAKE INSURANCE LIMITED v. ALL AMERICAN LIFE INSURANCE COMPANY | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Motions [148, 162] are granted in part and denied in part. Motion [134] is granted. Motions [140; 101] are denied. The Clerk of the Court is directed to enter judgment in favor of plaintiff-counterdefendant Sphere Drake Insurance Limited (f/k/a Odyssey Re (London) Limited) and against defendant-counterplaintiff All American Life Insurance Company (n/k/a American General Life Insurance Company) (a) declaring that the Unicare Retrocession (Registration No. AH 0115198) is void ab initio; (b) ordering that Sphere Drake return the Unicare Retrocession premiums received by Sphere Drake within 30 days after this judgment becomes final; (c) dismissing plaintiff's Count II and Count III "fiduciary duty claims" without prejudice; and (d) denying counterdefendant's counterclaim causes of action with prejudice.

(11) ■ For further detail see attached Memorandum Opinion and Order.

| | | | 7 | **Document Number** |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | SEP 2 2 2003 | |
| | Notified counsel by telephone. | U.S. DISTRICT COURT CLERK | date docketed | 170 |
| | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | 03 SEP 19 PM 4: 57 | 9/19/2003 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| | | FILED FOR DOCKETING ED-1 | | |
| cw | courtroom deputy's initials | | mqm | |
| | | Date/time received in central Clerk's Office | mailing initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**

SEP 2 2 2003

SPHERE DRAKE INSURANCE LIMITED, )
)
Plaintiff- )
Counterdefendant, )
)
v. )          No. 99 C 4573
)
ALL AMERICAN LIFE INSURANCE )
COMPANY, )
)
Defendant- )
Counterplaintiff. )

## MEMORANDUM OPINION AND ORDER

### I. BACKGROUND

The underlying dispute in this case concerns whether
plaintiff-counterdefendant Sphere Drake Insurance Limited,[1] an
English corporation, is liable to defendant-counterplaintiff All
American Life Insurance Company,[2] an Illinois corporation, on a
retrocession policy know as the "Unicare Retrocession."[3]   In its

---

[1]Sphere Drake has gone through various name changes
during the times pertinent to this lawsuit.   Throughout today's
opinion, plaintiff-counterdefendant will be referred to as
"Sphere Drake," regardless of the time period under discussion.

[2]At the end of 2002, All American merged into American
General Life Insurance Company.   The case will continue in the
name of defendant-counterplaintiff All American.   See Fed. R.
Civ. P. 25(c); Charles Alan Wright, Arthur R. Miller, & Mary Kay
Kane, Federal Practice & Procedure § 1958 (2d ed. 1986).

[3]"Retrocessional agreements are agreements by which an
insurance company which has agreed to reinsure a risk assigns all
or a portion of that risk to a reinsurer who accepts such risk.
In effect, a retrocessional agreement is reinsurance of
reinsurance."   United Equitable Insurance Co. v. Reinsurance Co.

Amended Complaint, Sphere Drake seeks a declaration that the
Unicare Retrocession is void because the Sphere Drake agent[4] that
issued the retrocession exceeded its authority in that EIU acted
beyond the monetary limits of the Binding Authority and with the
knowledge of a purported agent of All American (the "excess
authority" claim). Sphere Drake also contends EIU violated its
fiduciary duty with the knowledge of or in conspiracy with All
American's purported agents[5] (the "fiduciary duty" claim).
Sphere Drake seeks a declaration that the Unicare retrocession
was void _ab initio_; it does not seek any other relief. All
American counterclaims for a declaration that the Unicare
Retrocession is valid and enforceable and seeks compensatory

---

of America, Inc., 157 Ill. App. 3d 724, 510 N.E.2d 914, 916 n.3
(1st Dist.), appeal dismissed, 117 Ill. 2d 554, 517 N.E.2d 1096
(1987). The Unicare Retrocession reinsures the Unicare Insurance
Company, Workers Compensation Excess of Loss Reinsurance contract
(the "Unicare Reinsurance Policy").

[4]Sphere Drake's purported agent is Euro International
Underwriting Ltd. ("EIU"), an English corporation. EIU
purportedly acted under a subdelegation of binding authority (the
"Binding Authority") that Sphere Drake issued to Horace Holman
International Limited ("Horace Holman"). EIU's authorized
principals were John Whitcombe and Christopher Henton, both of
whom reside in England.

[5]The parties agree that Connecticut corporation WEB
Management LLC ("WEB") acted as the agent of All American. WEB
is partially owned by a subsidiary of Stirling Cooke Brown
Holdings Limited, a Bermuda corporation. English corporations
Stirling Cooke Insurance Brokers Limited and Stirling Cooke Brown
Reinsurance Brokers Limited (collectively "Stirling Cooke") are
also subsidiaries of Stirling Cooke Holdings. Sphere Drake
contends that Stirling Cooke acted as broker and agent for All
American, at the direction of WEB. All American contends that
Stirling Cooke was a reinsurance intermediary, which it contends
is not an agency relationship.

damages for the amount due under the Unicare Retrocession. All American also contended that all claims were subject to arbitration and continues to seek arbitration of any arbitrable claims. It has previously been held that the excess authority claim is an issue for the court to decide, not the arbitrator. Sphere Drake Insurance Ltd. v. All American Insurance Co., 256 F.3d 587, 590-92 (7th Cir. 2001) ("Sphere Drake II"). See also Sphere Drake Insurance Ltd. v. All American Life Insurance Co., 221 F. Supp. 2d 874, 877-78 (N.D. Ill. 2002) ("Sphere Drake IV"). If the excess authority claim is resolved in Sphere Drake's favor, the case is over and Sphere Drake is not liable on the Unicare Retrocession, but must return the premiums that were previously paid. If the excess authority claim is resolved against Sphere Drake, then the fiduciary duty claim must be considered, but that claim is to be resolved in arbitration, not by this court. Sphere Drake IV, 221 F. Supp. 2d at 879-80.

Presently pending are the parties' cross motions for summary judgment on the excess authority claim and Sphere Drake's related motions to strike some of the evidence submitted by All American. Sphere Drake contends that undisputed evidence shows that, as of June 29, 1998 when EIU purported to accept the Unicare Retrocession on Sphere Drake's behalf, EIU lacked actual authority because it was not permitted to accept further policies on Sphere Drake's behalf because EIU had already exceeded the $12,000,000 premium limit applicable in 1998 under the Binding Authority EIU had to act on Sphere Drake's behalf. Sphere Drake

- 3 -

contends that there could not be apparent authority for EIU's action because Stirling Cooke was actually aware the premium limit had been exceeded.  Alternatively, Sphere Drake contends that Stirling Cooke was constructively aware the premium limit had been exceeded because it knew there was a limit and had a duty to inquire as to whether it had been exceeded.  Sphere Drake also contends that WEB had a statutory obligation to be aware of EIU's authority to act on Sphere Drake's behalf.  Further, Sphere Drake contends that All American cannot show that it detrimentally relied upon any apparent authority that may have existed.  In another alternative argument, Sphere Drake contends that, if Stirling Cooke was not an agent of All American, Sphere Drake could not have entered into any contract with All American.

All American contends Sphere Drake cannot be entitled to summary judgment because disputed facts support that there was actual authority for EIU to act on Sphere Drake's behalf because the premium limit was actually $20,000,000 and the amount of premiums represented by policies was less than $20,000,000 and even less than $12,000,000.

As to its own summary judgment motion,[6] All American contends undisputed facts support that there was apparent authority because Stirling Cooke's knowledge of the premium limit indicated the premium limit was subject to modification and

---

[6]As to the contentions raised in its own summary judgment motion, All American alternatively contends that, to the extent there are material factual disputes, the factual disputes would be a basis for denying Sphere Drake's summary judgment motion.

Stirling Cooke was not required to inquire further as to whether the premium limit had been modified for 1998. All American also contends that Sterling Cooke did not have actual knowledge that the premiums for prior policies exceeded the existing premium limit nor was it required to inquire further. Additionally, All American contends Stirling Cooke was not its agent and therefore its knowledge cannot be imputed to WEB or All American. Alternatively, even if actual and apparent authority were both lacking, All American contends that Sphere Drake ratified the Unicare Retrocession, or waived objection thereto, by accepting premium payments and waiting until March 1999 before first attempting to rescind the contract.[7]

## II. SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. Turner v. J.V.D.B. & Associates, Inc., 330 F.3d 991, 994-95 (7th Cir. 2003); Palmer v. Marion County, 327 F.3d 588,

---

[7]"Rescission" is actually a misnomer in the context of the present case. Rescission is the unmaking of an existing contract. See Chicago Limousine Service, Inc. v. Hartigan Cadillac, Inc., 139 Ill. 2d 216, 564 N.E.2d 797, 801 (1990). Here, Sphere Drake contends it was never actually a party to the contract. That is a key distinction because, were Sphere Drake attempting to withdraw from a valid contract, the issue would be one for the arbitrator. In any event, since the parties use the term, this opinion will also use the term. However, use of the term should not be understood as implying that Sphere Drake is attempting to withdraw from a contract. Its action is more accurately one of repudiation.

592 (7th Cir. 2003); <u>Abrams v. Walker</u>, 307 F.3d 650, 653-54 (7th

Cir. 2002). The burden of establishing a lack of any genuine

issue of material fact rests on the movant. <u>Outlaw v. Newkirk</u>,

259 F.3d 833, 837 (7th Cir. 2001); <u>Wollin v. Gondert</u>, 192 F.3d

616, 621-22 (7th Cir. 1999). The nonmovant, however, must make a

showing sufficient to establish any essential element for which

it will bear the burden of proof at trial. <u>Celotex Corp. v.

Catrett</u>, 477 U.S. 317, 322 (1986); <u>Binz v. Brandt Construction

Co.</u>, 301 F.3d 529, 532 (7th Cir. 2002); <u>Traylor v. Brown</u>,

295 F.3d 783, 790 (7th Cir. 2002). The movant need not provide

affidavits or deposition testimony showing the nonexistence of

such essential elements. <u>Celotex</u>, 477 U.S. at 324. Also, it is

not sufficient to show evidence of purportedly disputed facts if

those facts are not plausible in light of the entire record. <u>See

NLFC, Inc. v. Devcom Mid-America, Inc.</u>, 45 F.3d 231, 236 (7th

Cir.), <u>cert. denied</u>, 515 U.S. 1104 (1995); <u>Covalt v. Carey

Canada, Inc.</u>, 950 F.2d 481, 485 (7th Cir. 1991); <u>Collins v.

Associated Pathologists, Ltd.</u>, 844 F.2d 473, 476-77 (7th Cir.),

<u>cert. denied</u>, 488 U.S. 852 (1988). As the Seventh Circuit has

summarized:

> The party moving for summary judgment
> carries the initial burden of production to
> identify "those portions of the pleadings,
> depositions, answers to interrogatories, and
> admissions on file, together with the affidavits,
> if any, which it believes demonstrate the absence
> of a genuine issue of material fact." <u>Logan v.
> Commercial Union Ins. Co.</u>, 96 F.3d 971, 978 (7th
> Cir. 1996) (citing <u>Celotex Corp. v. Catrett</u>,
> 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d
> 265 (1986) (citation and internal quotation

omitted)). The moving party may discharge this
burden by "'showing'--that is, pointing out to
the district court--that there is an absence of
evidence to support the nonmoving party's case."
Celotex, 477 U.S. at 325, 106 S. Ct. 2548. Once
the moving party satisfies this burden, the
nonmovant must "set forth specific facts showing
that there is a genuine issue for trial." Fed.
R. Civ. P. 56(e). "The nonmovant must do
more, however, than demonstrate some factual
disagreement between the parties; the issue
must be 'material.'" Logan, 96 F.3d at 978.
"Irrelevant or unnecessary facts do not preclude
summary judgment even when they are in dispute."
Id. (citation omitted). In determining whether
the nonmovant has identified a "material" issue
of fact for trial, we are guided by the
applicable substantive law; "[o]nly disputes that
could affect the outcome of the suit under
governing law will properly preclude the entry of
summary judgment." McGinn v. Burlington Northern
R.R. Co., 102 F.3d 295, 298 (7th Cir. 1996)
(citation omitted). Furthermore, a factual
dispute is "genuine" for summary judgment
purposes only when there is "sufficient evidence
favoring the nonmoving party for a jury to return
a verdict for that party." Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505,
91 L. Ed. 2d 202 (1986). Hence, a "metaphysical
doubt" regarding the existence of a genuine fact
issue is not enough to stave off summary
judgment, and "the nonmovant fails to demonstrate
a genuine issue for trial 'where the record taken
as a whole could not lead a rational trier of
fact to find for the non-moving party . . . .'"
Logan, 96 F.3d at 978 (quoting Matsushita Elec.
Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S.
574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538
(1986)).

Outlaw, 259 F.3d a 837.

Along with its answer to All American's summary judgment

motion, Sphere Drake filed a motion to strike. With its reply in

support of its own summary judgment motion, Sphere Drake filed an

essentially identical supplemental motion to strike. Both

motions concern All American's use of trial transcripts from an English lawsuit concerning similar issues regarding the Unicare Retrocession. Sphere Drake and All American are parties to that lawsuit, as well as all or some of the purported agents. Sphere Drake contends that any trial testimony is hearsay and that All American should have instead taken the depositions of the witnesses.

Sphere Drake did not notice either motion for presentation as is required by Local Rule 5.3(b). As is this bench's usual practice, following the initial motion to strike, an order was entered taking it under advisement to be decided with the summary judgment motions. This is done despite the fact that this bench looks with disfavor on separate motions to strike and expects a party to incorporate any evidentiary objections in either its summary judgment brief or a Local Rule 56.1 statement.[8] See N.D. Ill. Webpage for Judge Hart, "Motion Practice." See, e.g., Alek v. University of Chicago Hospitals, 2002 WL 1332000 *2 (N.D. Ill. June 17, 2002), aff'd by unpublished order, 54 Fed. Appx. 224 (7th Cir. Dec. 16, 2002); Anderson v. Cornejo, 225 F. Supp. 2d 834, 842 (N.D. Ill. 2002). Instead of using its reply to respond to the objections included in the first motion to strike, All American waited until briefing on both summary judgment motions was completed and then jointly

---

[8]Sphere Drake also included the evidentiary objections in its Local Rule 56.1 response statement opposing All American's summary judgment motion and in its Local Rule 56.1 reply statement in support of its own summary judgment motion.

moved with Sphere Drake for a briefing schedule on the two motions to strike. At the May 14, 2003 hearing on the briefing schedule motion, All American's motion to file an answer was denied and All American was advised that it should have responded in its reply brief. The court also noted that it was generally capable of ruling on hearsay issues without additional input from the parties. Sphere Drake should not have filed separate motions to strike, but once it did, All American should have responded in its reply brief, particularly since the objections were also incorporated in Sphere Drake's Local Rule 56.1 response statement. Nevertheless, in spite of the unnecessary and burdensome complexity, the court will consider the evidentiary objections.

Sphere Drake's objections are generally without merit and represent a misunderstanding of summary judgment procedures. The material that is submitted in support of a summary judgment motion is not necessarily itself admissible at trial, but must set forth evidence that would be admissible if presented in appropriate form at trial. In other words, "[t]he evidence need not be admissible in form (for example, affidavits are not normally admissible at trial), but it must be admissible in content." Stinnett v. Iron Works Gym/Executive Health Spa, Inc., 301 F.3d 610, 613 (7th Cir. 2002). Prior testimony under oath, whether at a deposition, hearing, or trial, that is based on personal knowledge may be considered on summary judgment because the person is likely to provide the same testimony if called to

testify at trial. It is well settled that testimony given at the trial of a different case may be considered on summary judgment. Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1415 n.12 (5th Cir. 1993), cert. denied, 510 U.S. 1043 (1994); Langston v. Johnson, 478 F.2d 915, 918 (D.C. Cir. 1973); Beiswenger Enterprises Corp. v. Carletta, 46 F. Supp. 2d 1297, 1299 (M.D. Fla. 1999); Kraft General Foods, Inc. v. Cattell, 18 F. Supp. 2d 280, 284 (S.D.N.Y. 1998). Moreover, to the extent the witnesses are not available for trial, which is a substantial possibility given that all or most are residents of the United Kingdom, the former testimony itself would be admissible at a trial of this case. See Fed. R. Evid. 804(b)(1).

There is another aspect of Sphere Drake's objections that has merit. All American cites to comments of the English justice who presided at the trial. These comments are not findings because no ruling or judgment has yet been entered following the English trial. There is no contention that any of the statements are entitled to a collateral estoppel effect. The comments of Justice Thomas will not be considered. Questions that Justice Thomas asked of witnesses and the responses thereto will be considered to the same extent as responses to questions asked by the attorneys.

Sphere Drake also objects to the use of certain letters. To the extent the letters are potentially evidence of material facts, they will be individually considered in determining whether a genuine factual dispute exists. It is noted, though,

that they may be admissible as party admissions.  They also may be considered as evidence of communications that occurred or actions that were taken, not necessarily for the truth of the matters contained therein.

Sphere Drake's motions to strike will be granted in part and denied in part.  No document will be stricken, but, to the extent the documents represent inadmissible evidence, they will not be considered as supporting a genuine factual dispute.

### III. APPLICABLE LAW

All American contends Illinois law applies to the excess authority claim whereas Sphere Drake contends English law is applicable.  The Unicare Retrocession, which is in the form of a slip policy,[9] provides in part:  "This contract of Reinsurance shall be governed by and construed in accordance with the law of the state of Illinois, U.S.A."  Sphere Drake contends that this provision is inapplicable to contract formation issues[10] and

---

[9]"A slip policy is a common type of policy in reinsurance.  It contains an abbreviated statement of terms and generally incorporates another insurance contract to define the extent of coverage."  Odyssey Re (London) Ltd. v. All American Life Insurance Co., No. 99 C 4573, at 3 (N.D. Ill. March 30, 2000) ("Sphere Drake I") (Docket Entry 28).

[10]Sphere Drake cites Northeast Data Systems, Inc. v. McDonnell Douglas Computer Systems Co., 986 F.2d 607, 611 (1st Cir. 1993), for the general proposition that choice-of-law provisions do not apply when contract formation is at issue.  That case does not stand for that proposition.  Instead, Northeast Data held that the particular language of the choice-of-law provision involved in that case did not provide that it was applicable to formation issues.

that, instead, English law should be applied because it has the most significant relationship to the transaction. This issue need not be decided. As to every issue for which either side cites both Illinois and English law, both contend that the law of both jurisdictions is the same. Where the parties do not point to any conflict or outcome difference between possibly applicable laws, a federal court will apply the law of the state in which it sits. Gould v. Artisoft, Inc., 1 F.3d 544, 549 n.7 (7th Cir. 1993). Substantive Illinois law will be applied to the contract issues before the court that underlie the excess authority claim.

## IV. ACTUAL AUTHORITY

In order for Sphere Drake to be entitled to summary judgment, undisputed facts must support, among other things, that EIU lacked actual authority to act on Sphere Drake's behalf when entering into the Unicare Retrocession. All American contends there are material factual disputes regarding both the amount of the premium limit for 1998 and the amount of premiums represented by 1998 retrocessions that EIU had entered into purportedly on behalf of Sphere Drake.

There is no dispute that Sphere Drake entered into the Binding Authority which permitted EIU to act as its agent for retrocessional agreements. However, the Binding Authority contained a premium limit, that is a provision that EIU could not enter into retrocessional agreements that exceeded a certain monetary amount of estimated gross premiums for each year. In

January 1997, the Binding Authority provided in part: "The initial Estimated Gross Premium is to be agreed not exceeding £2 million (to be increased by mutual agreement) and information to be disclosed in Business Plan." Another provision of the Binding Authority provided for a set conversion rate of two dollars equal one pound, making the initial premium limit equivalent to $4,000,000. In March 1997, the gross premium limit was increased to $7,000,000 (£3,500,000). In December 1997, the limit was increased to $12,000,000 (£6,000,000). Sphere Drake contends this was the premium limit that remained in effect as of June 1998 when EIU accepted the Unicare Retrocession. All American contends that the reference to the EIU Business Plan indicates that the anticipated mutually agreed premium limit increases were to be consistent with EIU's Business Plan. The EIU Business Plan forecast $20,000,000 of gross premiums for 1997 and $28,000,000 for 1998. However, Sphere Drake required that increases in the gross premium limit be approved on a piecemeal basis.

Resolving all genuine factual disputes in All American's favor, the facts assumed to be true as regards actual authority are as follows. Vic Broad was the Sphere Drake underwriter and Director responsible for overseeing the agency relationship with EIU. In May 1998, EIU's Whitcombe asked Broad to increase the premium limit to $20,000,000. Broad referred Whitcombe to Michael Watson, Broad's superior and Sphere Drake's then-CEO. On June 3, 1998, Whitcombe met with Watson. At the English trial, Whitcombe testified about this meeting. Although, Whitcombe

conclusorily stated at one point that his understanding after the
meeting was that he had approval to write up to $20,000,000 in
gross premiums, his specific testimony is to the contrary.
Whitcombe testified that Watson indicated in principle that he
would not oppose an increase but Broad was to put such approval
and any details in writing.  <u>See</u> March 27, 2002 English Trial Tr.
at 32-39.  No such writing was ever produced or approved.

The communications that followed were that Whitcombe sent
Watson a June 9, 1998 letter stating in part:

> It is my understanding that controlled
> expansion to a level of premium income in the
> region of $20,000,000 for 1998 would not alarm
> you and would certainly afford me a sound basis
> on which to plan events.
> I am aware that you will be discussing our
> conversation with Vic Broad with a view to
> settling your own plans and wishes for the
> future.  I will await his instructions.

In a letter dated June 17, 1998, Watson responded in
part:

> As I mentioned, the level of premium income
> which you would like to underwrite for 1998
> would make you one of the largest individual
> coverholders for our company.  It is therefore
> of paramount importance that the expansion is
> carefully controlled.  I would like to under-
> stand the source of the new business and how it
> compares with the business mix which you provided
> to us initially.  . . .  As we both know, the
> recent administration of this facility through
> our shared intermediary has left a lot to be
> desired and this is a good opportunity to make
> sure all aspects are properly addressed.  I have
> asked Vic Broad to address the relevant under-
> writing issues with you and Bob Forness, our
> Chief Operating Officer is addressing the
> administrative arrangements.

Please continue on a "business as usual"
basis for now. I would like to feel that all of
our necessary updating of records, information
and procedures could be completed by mid-July.

These communications are consistent with the testimony
that Watson indicated he looked favorably on an increase, but had
not actually agreed to an increase. "Business as usual" would
mean that there would continue to be piecemeal increases on an
individual basis. All American provides no document showing that
the increase to $20,000,000 was ever reduced to writing.

All American does not point to evidence adequately
supporting a genuine factual dispute that the premium limit was
ever increased to higher than $12,000,000 (£6,000,000).

Still to be considered is whether a genuine factual
dispute exists regarding whether the $12,000,000 limit was
exceeded in 1998. Sphere Drake contends that undisputed evidence
shows that policies issued earlier in 1998 totaled $14,406,427 in
gross estimated premiums and that the Unicare Retrocession itself
exceeded the limit because it actually represented $19,659,062 in
estimated gross premiums for 1998. All American does not raise
any specific objections to the amount of estimated gross premiums
Sphere Drake calculates for the preceding policies. See All
American's Loc. R. 56.1 Response [145] ¶¶ 20-89; All American
Answer Brief [146] at 10-12. All American contends that the
correct 1998 gross premium calculation for the Unicare
Retrocession is $9,864,917, the primary dispute being whether an
approximately $19,600,000 premium should be evenly divided

between 1998 and 1999 or whether it should all be considered 1998 gross premiums. All American's primary position, though, is that a Sphere Drake designee, Nick Bentley, admitted during his Rule 30(b)(6) deposition that no valid 1998 premiums existed prior to the Unicare Retrocession and that the Unicare Retrocession represented $6,200,000 in gross premiums.

All American's primary position is without merit. The cited testimony of Bentley that zero valid premiums existed as of June 1998 is based on taking as true Sphere Drake's contention that all policies were invalid based on the alleged fiduciary breach violations. See Bentley Dep. at 16-17. That is an alternative contention that is not presently under consideration. For present purposes, it must be assumed that no fiduciary duty violations occurred and the only question is whether EIU otherwise had actual or apparent authority. Bentley's testimony does not raise a genuine factual dispute as to the gross premiums for retrocession agreements EIU had already committed to for 1998. Since the gross premiums exceeded $12,000,000, EIU had already reached the limits of its actual authority prior to entering into the Unicare Retrocession in June 1998.[11]

---

[11]The $6,200,000 premium figure for the Unicare Retrocession is based on a dollar amount shown on the slip policy. Bentley testified that that is the amount that would have been apparent to an underwriter at the time the slip policy was issued. All American does not dispute that the actual estimated gross premium is at least $9,864,917. Adding that amount to the undisputed $14,406,427 of prior premiums, the Unicare Retrocession would have put EIU well over the limit even if the limit were $20,000,000.

Undisputed facts show that EIU exceeded the premium limit. Therefore, it cannot possibly be shown that EIU had actual authority to enter into the Unicare Retrocession.

## V. APPARENT AUTHORITY

Under Illinois law, "an agent may bind his principal by acts which the principal has not given him <u>actual</u> authority to perform, but which he <u>appears</u> authorized to perform." <u>Lundberg v. Church Farm, Inc.</u>, 151 Ill. App. 3d 452, 502 N.E.2d 806, 813 (2d Dist. 1986), <u>appeal denied</u>, 114 Ill. 2d 547, 508 N.E.2d 729 (1987). "An agent's apparent authority is that authority which 'the principal knowingly permits the agent to assume or which he holds his agent out as possessing. It is the authority that a reasonably prudent man, exercising diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess.'" <u>Id.</u> (quoting <u>Hofner v. Glenn Ingram & Co.</u> 140 Ill. App. 3d 874, 489 N.E.2d 311, 316 (1st Dist. 1985)). <u>Accord A.J. Maggio Co. v. Willis</u>, 316 Ill. App. 3d 1043, 738 N.E.2d 592, 598 (1st Dist. 2000), <u>appealed dismissed</u>, 197 Ill. 2d 397, 757 N.E.2d 1267 (2001); <u>International Union of Operating Engineers v. Triad Construction Services, Inc.</u>, 1999 WL 571053 *7 (N.D. Ill. July 29, 1999). Apparent authority must derive from acts of the principal. <u>Lundberg</u>, 502 N.E.2d at 813. In the present case, the burden is on All American to prove the existence of apparent authority, including by showing Stirling Cooke or WEB had knowledge of the facts and that a reasonably

prudent person would have relied on those facts.  Id.; Triad
Construction, 1999 WL 571053 at *7.  The inquiry focuses on three
factors:  (1) the manifestation to the third party by the
principal; (2) the reasonableness of the third party's belief
that authority extended to the act of the agent; and (3) the
third party's detrimental reliance on the apparent authority.
Aspacher v. Kretz, 1997 WL 692943 *5 (N.D. Ill. Aug. 13, 1997).

All American points to the principle that apparent
authority is not limited by instructions that the principal may
have placed on the agent, but which were not disclosed to the
third party.  See Lundberg, 502 N.E.2d at 813.  However, the
third party still must act with reasonable discretion and
diligence.  If the third party has information indicating that
the agent's authority may be limited, it must make reasonable
inquiry to ensure that there is authority.  General Refrigeration
& Plumbing Co. v. Goodwill Industries of St. Louis, Mo., 30
Ill. App. 3d 1081, 333 N.E.2d 607, 611 (5th Dist. 1975); Lincoln
Cardinal Partners v. Barrick, 218 Ill. App. 3d 473, 578 N.E.2d
316, 318-19 (4th Dist. 1991); Schoenberger v. Chicago Transit
Authority, 84 Ill. App. 3d 1132, 405 N.E.2d 1076, 1082 (1st Dist.
1980); Harrison v. Dean Witter Reynolds, Inc., 715 F. Supp. 1425,
1431-32 (N.D. Ill. 1989), aff'd in part, rev'd in part on other
grounds, 974 F.2d 873, 883-84 (7th Cir. 1992), cert. denied,
509 U.S. 904 (1993); Rouse Woodstock, Inc. v. Surety Federal
Savings & Loan Association, 630 F. Supp. 1004, 1010 (N.D. Ill.
1986).  See also Restatement (Second) of Agency §§ 166-67 (1958);

_Almerico v. RLI Insurance Co._, 716 So. 2d 774, 780 (Fla. 1998);

_Diversified Development & Investment, Inc. v. Heil_, 119 N.M. 290,

889 P.2d 1212, 1218-19 (1995).  _Cf. Herbert Construction Co. v._

_Continental Insurance Co._, 931 F.2d 989, 996 (2d Cir. 1991) (duty

to inquire as to apparent authority is another way of saying that

third party must act reasonably in relying on apparent

authority).

> The duty one has when dealing with an agent
> with apparent authority is set out in 3 Am. Jur.
> 2d, Agency, sec. 78 (applied in _Lawcock v. United_
> _States Trotting Association_, [55 Ill. App. 2d
> 211, 204 N.E.2d 802 (1st Dist. 1965)]):
>> "A third person dealing with a known agent
>> may not act negligently with regard to the
>> extent of the agent's authority or blindly
>> trust the agent's statements in such
>> respect.  Rather, he must use reasonable
>> diligence and prudence to ascertain whether
>> the agent is acting and dealing with him
>> within the scope of his powers.  The mere
>> opinion of an agent as to the extent of his
>> powers, or his mere assumption of authority
>> without foundation, will not bind the
>> principal, and a third person dealing with a
>> known agent must bear the burden of
>> determining for himself by the exercise of
>> reasonable diligence and prudence, the
>> existence or nonexistence of the agent's
>> authority to act in the premises.  The
>> principal, on the other hand, may act on the
>> presumption that third persons dealing with
>> his agent will not be negligent in failing
>> to ascertain the extent of his authority as
>> well as the existence of his agency."
> Substantially the same rule is set out in 2A
> C.J.S. Agency § 162, at p. 801-802.  Although we
> do not find it necessary to also quote that
> entire section here, one sentence which appears
> at page 802 is particularly worth mentioning.
>> "If [the third person] knows, or has good
>> reason for believing, that the acts exceed
>> the agent's powers or if such reasonable
>> inquiry as he is under the duty to make
>> would result in a discovery of the true

> state of the powers, and he fails to fulfill
> that duty, he cannot assert an apparent
> authority effective against the principal."

General Refrigeration, 333 N.E.2d at 611.  The determination of
whether a duty to inquire arose and/or the third party acted
reasonably must be made in light of all the surrounding facts and
circumstances.  See Jackson Rapid Delivery Service, Inc. v.
Thomson Consumer Electronics, Inc., 210 F. Supp. 2d 949, 954
(N.D. Ill. 2001); Redex, Inc. v. Melmark Cartage Co., 1989 WL
68480 *1 (N.D. Ill. June 16, 1989).  Cf. Shapo v. Underwriters
Management Corp., 2002 WL 31155059 *12 (N.D. Ill. Sept. 27, 2002)
(inherent authority).

Here, it is undisputed that Stirling Cooke actually knew
that a premium limit existed that was possibly subject to being
increased.  It is undisputed that, in 1997, Stirling Cooke
received a copy of the Binding Authority which contained the
£2,000,000 ($4,000,000) gross premium limit.  It is also
undisputed that, in February 1998, Stirling Cooke received an
addendum showing the premium limit had been increased to
£3,500,000 ($7,000,000).  Both the Binding Authority itself and
the addendum were acts of Sphere Drake.  There is no contention
that Stirling Cooke was actually aware of the increase to
$12,000,000.  Also, it is undisputed that, during the first six
months of 1998, Stirling Cooke had brokered all but one of the
other retrocessional agreements in which EIU purported to act on
behalf of Sphere Drake under the same Binding Authority, and the

one it did not broker represented only $81,818 in estimated gross premiums. Thus, Stirling Cooke would have been aware that, prior to the Unicare Retrocession, the estimated gross premiums had already exceeded both $7,000,000 and $12,000,000. Also, it would have been aware that the Unicare Retrocession itself represented at least $9.9 million, which was itself more than the known $7,000,000 limit. Under these circumstances, Stirling Cooke would be obliged to make reasonable inquiry as to whether the premium limit had been increased and whether the limit had been reached. Cf. General Refrigeration, 333 N.E.2d at 611-13; Almerico, 716 So. 2d at 780.

All American cites American Insurance Co. v. Meyer Steel Drum, Inc., 1990 WL 92882 *4 n.4 (N.D. Ill. June 27, 1990), but that case is distinguishable. There, the insurer had no notice that the insured had set any premium limit as to insurance procured by the insured's agent. Without any notice of there being a possible premium limit, the insurer did not act unreasonably in failing to inquire as to whether one existed. The present case is different. Here, Stirling Cooke was aware the Binding Authority contained a premium limit that was possibly subject to change, but did not inquire as to whether the limit had been increased or reached even though it was also aware that a number of policies had previously been accepted which already exceeded the known premium limit under the Binding Authority.

All American contends that Stirling Cooke had no duty to inquire as to whether EIU had exceeded the premium limit because

the customary practice in the reinsurance industry is that third
parties are not expected to monitor the amount of premium that an
agent is writing.  Custom and practice in the industry is part of
the totality of circumstances to be considered in determining if
the third party has acted reasonably and diligently.  See Lincoln
Cardinal, 578 N.E.2d at 318.  However, where the third party has
sufficient indications contrary to the usual custom and practice,
the third party does not act reasonably by relying on the usual
custom and practice to establish apparent authority.  See id. at
318-19 (although industry practice was that a residential
property manager also had authority to enter into leases with a
provider of laundry machines, provider of laundry machines did
not reasonably rely on that practice where it was apparent that
the property manager was acting in his own self interest).  The
evidence relied upon by All American would support that, under
industry practice, a third party would not be expected to monitor
how much premium an agent is writing because the third party
would not be privy to the agent's other business.[12]  Such a
practice, however, is irrelevant to the circumstances of this
case.  This is not a situation where Stirling Cooke was ignorant
of the amount of premiums written by EIU because EIU was doing

---

[12]Sphere Drake points to evidence that a broker in
Stirling Cooke's situation would, in order to protect its
client's interests, make reasonable inquiries to ensure that an
agent is acting within its authority.  The general rule is that a
reinsurance broker has a duty to exercise the care of a
reasonably prudent businessperson on behalf of its client.  See
Graydon S. Staring, Law of Reinsurance § 7:3[2] (1993).

business with other entities.  Stirling Cooke itself was involved
in transactions with EIU that represented more than $14,000,000
in gross premiums for 1998, not counting the Unicare
Retrocession.  Thus, without inquiring as to other business in
which EIU was engaged, Stirling Cooke was already aware of 1998
business that well exceeded the premium limit of which it had
been informed.  Also, the Unicare Retrocession itself exceeded
the known premium limit.  Under these circumstances, Stirling
Cooke would have a duty to reasonably and diligently inquire as
to whether EIU had authority to accept the Unicare Retrocession.

The undisputed evidence shows that Stirling Cooke could
not have acted reasonably and diligently in assuming EIU had
authority to accept the Unicare Retrocession.  All American,
however, contends that Stirling Cooke's knowledge of the premium
limit and the gross premiums represented by the prior policies
cannot be imputed to it because Stirling Cooke was not its agent.
Instead, All American contends that, although WEB (an admitted
agent of All American) authorized Stirling Cooke to place the
Unicare Retrocession on All American's behalf, Stirling Cooke was
not acting as WEB's or All American's agent but as a reinsurance
intermediary that brokered a deal between EIU and WEB.  A
reinsurance intermediary, however, is generally considered to be
acting as an agent of the ceding insurer (All American), though
whether and for whom the intermediary was an agent may still be a
question of fact in a particular case.  See Capitol Indemnity
Corp. v. Stewart Smith Intermediaries, Inc., 229 Ill. App. 3d

119, 593 N.E.2d 872, 876 (1st Dist.), appeal denied, 146 Ill. 2d
623, 602 N.E.2d 447 (1992); Philan Insurance Ltd. v. Frank B.
Hall & Co., 748 F. Supp. 190, 192 n.2 (S.D.N.Y. 1990); Graydon S.
Staring, Law of Reinsurance §§ 7:4, 7:2[1], 7:3[1] (1993);
John L. Baringer, "The Reinsurance Market: The Assuming
Reinsurer," in Reinsurance 329, 334-35 (Robert W. Strain ed.,
1980); Richard S. Bakka, "Claims Management," in Reinsurance
546, 550 (Robert W. Strain ed., rev. ed. 1997).[13] Compare John
M. Sheffey, Reinsurance Intermediaries: Their Relationship to
Reinsured and Reinsurer 16 Forum 922 (1981).[14] Although All
American contends there is at least a factual dispute as to
whether Stirling Cooke was its agent, All American admits that
Stirling Cooke entered into and negotiated the Unicare
Retrocession on its behalf and points to no sufficient
evidentiary basis for finding that Stirling Cooke was not acting
as its agent in the transaction. Cf. In re Pritchard & Baird,
Inc., 8 B.R. 265, 269-70 (D.N.J. 1980), aff'd by unpublished
orders, 673 F.2d 1299, 1301 (3d Cir. 1981); Wright v. Sullivan

-----

[13]The one general exception is that the intermediary is
generally not considered to be the ceding insurer's agent in
regard to holding premium payments. See Philan, 748 F. Supp. at
197; Staring, § 7:2[1]; Baringer at 334-35. That is not an issue
in the present case.

[14]Sheffey acknowledges that case law as of 1981 supported
that a reinsurance intermediary is an agent of the reinsurer or
reinsured, with some cases and commentators assuming the
intermediary is the agent of the reinsured. See Sheffey, 16
Forum at 934 & n.41. Sheffey argues that the general rule should
instead be that the intermediary ordinarily should not be
considered the agent of either the reinsured or reinsurer.

_Payne Co._, 839 S.W.2d 250, 253 (Ky. 1992). Thus, the evidence
only supports that Stirling Cooke was acting as All American's
agent and, as discussed above, Stirling Cooke's knowledge
precludes finding that apparent authority existed. Moreover,
even if Stirling Cooke was not All American's agent, All American
would still have the burden of showing that WEB had a basis for
assuming apparent authority existed. WEB never received a copy
of the Binding Authority and thus, without relying on Stirling
Cooke's knowledge, WEB had no acts of Sphere Drake from which it
could base a reasonable belief of apparent authority, especially
since, as discussed below, WEB had a statutory duty to obtain and
retain written evidence of EIU's authority to act on Sphere
Drake's behalf.

WEB is licensed as a reinsurance intermediary-manager
under Connecticut law. _See_ Conn. Gen. Stat. §§ 38a-760a(7);
38a-760b. WEB was acting as a reinsurance intermediary-manager
for All American. Connecticut law requires that "[f]or at least
ten years after expiration of each contract of reinsurance
transacted by the reinsurance intermediary-manager, the
reinsurance intermediary-manager shall keep a complete record
of each transaction showing . . . (K) when the reinsurance
intermediary-manager places a reinsurance contract on behalf of a
ceding insurer . . . (ii) if placed through a representative of
the assuming reinsurer, other than an employee, written evidence
that such reinsurer has delegated binding authority to the
representative." _Id._ § 760f(a)(4)(K)(ii). All American contends

- 25 -

this statute is inapplicable to the Unicare transaction because the statute only applies to transactions between a reinsurance intermediary-manager (WEB) and the reinsured (All American). The Unicare Retrocession, however, did involve a transaction between WEB and All American, that is WEB acting on behalf of All American. In such circumstances, where the intermediary-manager (WEB) is placing a reinsurance contract (the Unicare Retrocession) on behalf of a ceding insurer (All American) and doing so through a representative (EIU) of the reinsurer (Sphere Drake), the intermediary-manager (WEB) must maintain complete records, including written evidence that the reinsurer (Sphere Drake) has delegated binding authority to the representative (EIU). Thus, WEB had a statutory obligation to obtain and keep written evidence of the Binding Authority that Sphere Drake had issued to EIU. Had, WEB satisfied that statutory obligation, it would have been aware that the Binding Authority contained a premium limit and would have been on notice to inquire further. It is undisputed that WEB was aware the Unicare Retrocession was entered into with a representative of Sphere Drake and WEB nevertheless obtained no evidence of EIU's authority to act on Sphere Drake's behalf. Had WEB obtained a copy of the Binding Authority from Stirling Cooke, it would have been aware of the premium limit. Had it inquired further, it could have learned from Stirling Cooke[15] that the known $7,000,000 limit had already

---

[15]WEB was not involved in all the Sphere Drake related transactions in which Stirling Cooke and EIU participated, so its

been exceeded. And even if WEB did not learn of the earlier premiums, WEB would have known that the Unicare Retrocession itself exceeded the known $7,000,000 limit, thus putting it on notice to inquire further. Under these circumstances, it could only be found that WEB acted negligently in failing to perform its statutory duty and therefore could not rely on apparent authority. See General Refrigeration, 333 N.E.2d at 611-13. Thus, even if Stirling Cooke were not considered to be WEB's and All American's agent, there would not be an adequate basis for finding apparent authority existed.

All American also contends that apparent authority can be based on EIU accepting prior retrocessions on Sphere Drake's behalf without any protest from Sphere Drake. That, however, assumes that Sphere Drake received prompt and accurate information regarding the acceptance of new retrocessions. Undisputed evidence shows that the most recent bordereau[16] EIU provided to Sphere Drake prior to the Unicare Retrocession was the May 1998 bordereau which indicated EIU was still within the premium limits. There is no evidence that Stirling Cooke had knowledge that Sphere Drake was receiving prompt and accurate

_____

knowledge as to the over $12,000,000 in earlier premiums would have to come from Stirling Cooke.

    [16]A "bordereau" is "[a] description of reinsured risks; esp., a periodic report provided by a cedent to a treaty reinsurer, consisting of basic information affecting the reinsurance treaty, such as the underlying insureds, the types of risks covered, policies, and dates of loss." Black's Law Dictionary 178 (7th ed. 1999).

information regarding the gross premiums of the retrocessions being accepted. This is in contrast to Stirling Cooke which, in placing the retrocessions, would have had accurate information regarding premiums under the retrocession. Moreover, the evidence indicates that industry practice did not require immediate forwarding of the necessary documents for accurately determining when a retrocession was accepted and the amount of premium involved and All American points to no evidence to the contrary. Additionally, Stirling Cooke never attempted to ascertain whether the premium limit had actually been increased nor whether EIU was approaching the then-existing limit. Just because one policy was being accepted without protest, it did not mean that the next policy to be accepted would still keep EIU within the limit. This was especially true of the Unicare Retrocession's minimum $9,864,917 premium which, by itself, exceeded the previously known premium limit. The lack of a prior protest from Sphere Drake could not be a reasonable basis for assuming the premium limit would not be breached by the Unicare Retrocession, especially when considering that Stirling Cooke had made no attempt to follow up on its prior knowledge that a premium limit existed.

For the foregoing reasons, the undisputed facts show that All American had no sufficient basis for relying on apparent authority. It is unnecessary to also consider whether All American satisfies the detrimental reliance requirement for apparent authority to control.

## VI. RATIFICATION, ESTOPPEL, & WAIVER

There is no dispute that, up to the time of the Unicare Retrocession, EIU was providing reports to Sphere Drake which indicated that the gross premiums for retrocessions accepted by EIU were below the existing premium limit. Because of problems regarding a particular policy, however, in late June and late July 1998, Sphere Drake began audits of the EIU retrocessions. All American contends that, by at least August 5, 1998, Sphere Drake was aware that the premium limit had been exceeded. It further contends that (a) Sphere Drake's continued acceptance of premium payments and (b) Sphere Drake waiting until March 1999 to notify All American that it was rescinding the Unicare Retrocession constitute ratification of the Unicare Retrocession or waiver or estoppel of any right to repudiate the contract. All American also contends that Sphere Drake acted inconsistently with nonacceptance or repudiation by seeking its own reinsurance for the Unicare Retrocession.

Where an agent acts without authority in entering into a contract on the principal's behalf, the contract may still be ratified by the principal. Stathis v. Geldermann, Inc., 295 Ill. App. 3d 844, 692 N.E.2d 798, 808 (1st Dist.), appeal denied, 179 Ill. 2d 620, 705 N.E.2d 450 (1998); Triad Construction Services, Inc., 1999 WL 571053 at *9; Chicago Painters & Decorators Pension, Health & Welfare v. Five Star Commercial & Industrial

<u>Painting, Inc.</u>, 1998 WL 178813 *2 (N.D. Ill. April 10, 1998).

> Ratification occurs when the principal learns of
> an unauthorized transaction, then retains the
> benefits of the transaction or takes a position
> inconsistent with nonaffirmation. <u>Progress
> Printing Corp. v. Jane Byrne Political Committee</u>,
> 235 Ill. App. 3d 292, 310, 601 N.E.2d 1055 (1992)
> (<u>Progress Printing</u>). For ratification to occur,
> the principal must, with full knowledge of the
> act, manifest an intent to abide and be bound by
> the transaction. <u>Peskin v. Deutsch</u>, 134 Ill.
> App. 3d 48, 55, 479 N.E.2d 1034 (1985).
> Ratification may be inferred from surrounding
> circumstances, including long-term acquiescence,
> after notice, to the benefits of an allegedly
> unauthorized transaction. <u>Progress Printing</u>, 235
> Ill. App. 3d at 310, 601 N.E.2d 1055.

<u>Stathis</u>, 692 N.E.2d at 808. "[R]atification will not be implied
. . . from acts or conduct which are as consistent with an
intention not to ratify as to ratify." <u>In re Midway Airlines,
Inc.</u>, 180 B.R. 851, 920 (Bankr. N.D. Ill. 1995) (quoting <u>Evanston
Bank v. ContiCommodity Services, Inc.</u>, 623 F. Supp. 1014, 1037
(N.D. Ill. 1985) (quoting <u>Arthur Rubloff & Co. v. Drovers
National Bank of Chicago</u>, 80 Ill. App. 3d 867, 400 N.E.2d 614,
618 (1st Dist. 1980))); <u>Williams v. National Housing Exchange,
Inc.</u>, 45 F. Supp. 2d 648, 653 (N.D. Ill. 1999). The burden is on
All American to establish ratification. <u>Midway</u>, 180 B.R. at 920.

Growing out of difficulties surrounding a claim known as
the "Versace claim," Sphere Drake decided to conduct an
investigation of EIU practices. On June 30, 1998, under the
direction of Sphere Drake's Bentley, an administrative audit of
the EIU underwriting was conducted at Horace Holman. This

revealed administrative problems and by mid-July 1998, Sphere Drake had decided to conduct a more thorough audit. On July 28 and 29, 1998, Sphere Drake employees Michael Mather and John Coppinger conducted the audit. They issued a report dated August 5, 1998. In the report, it was concluded that, through June 30, 1998, EIU had written at least $16,683,818 in gross premiums which was specifically identified as being in excess of the £6,000,000 ($12,000,000) premium limit for 1998. The report also indicated that EIU failed to adequately evaluate the risks and value of the retrocessions it accepted. Sphere Drake did not then take any action to rescind any of the retrocessions that may have been entered into in excess of the premium limit nor did it then seek rescission for any other reason. On August 7, 1998, Sphere Drake CEO Watson did inform Whitcombe that EIU needed to stop underwriting because the premium limit had been exceeded. A moratorium on further underwriting had already been put in place effective July 28, 1998.

The August 5, 1998 report was not considered to be conclusive. It caused Sphere Drake to conduct further investigation, including into possible collusion between EIU and Stirling Cooke. More directly related to the excess authority claim and ratification is the undisputed evidence that, as of August 1998, Sphere Drake did not yet have enough information to determine the order in which retrocessions were accepted. Thus, while Sphere Drake could determine, at least preliminarily, that the premium limit had been exceeded, it could not yet determine

which retrocessions were the ones accepted when and after the limit was reached. Thus, in August 1998, Sphere Drake was not yet in a position to determine which retrocessions were unauthorized because issued in excess of the premium limit and thus also not in a position to yet rescind particular retrocessions. Sphere Drake's investigation of EIU continued through March 1999 and beyond. It took at least two more months just to determine who had participated in particular retrocession programs. Robert Forness of Sphere Drake testified: "it took [Sphere Drake] at least a couple of months just to identify who had participated in various programs and to arrange visits to speak to them or to schedule audits. I don't believe even by October [1998] we had a full understanding of what had occurred. We were starting to put a picture together, but that's about how I would describe it." The burden is on All American to establish ratification, including when Sphere Drake may have become informed as to material facts. All American does not point to evidence, other than the August 5 report itself, as to when Sphere Drake may have determined the Unicare Retrocession was one of the retrocessions accepted in violation of the premium limit. However, from Forness's testimony, it can be reasonably inferred that such a determination could be made sometime in October 1998. On Sphere Drake's summary judgment motion, that inference will be drawn and taken as true. It, however, is not the only inference that may be drawn. On All American's motion,

it must be taken as true that Sphere Drake did not actually have such knowledge until March 1999.

All American also contends that Sphere Drake was at fault for failing to adequately monitor EIU's underwriting. Although the principal's actual knowledge of material facts is generally the pertinent issue regarding ratification, "one whose ignorance or mistake was the result of gross or culpable negligence in failing to learn the facts will be estopped as if he had actual knowledge." Progress Printing, 601 N.E.2d at 1067-68 (quoting 18 Ill. Law & Prac. Estoppel § 23 at 84 (1956)); In re Ostrom-Martin, Inc., 202 B.R. 267, 274 (Bankr. C.D. Ill. 1996). Evidence supports that Broad was sloppy and not particularly diligent in monitoring EIU. (Sphere Drake points to contrary evidence that Broad closely examined at least some aspects of the bordereaux provided to him.) However, the bordereaux that EIU provided contained information showing the EIU remained below the premium limit. More closely examining the bordereaux would not have revealed that the premium limit had been exceeded. Such a determination would have required obtaining additional documents and conducting a more detailed examination. Events in this case show that a determination that the premium limit had been exceeded required an audit and further investigation was needed to determine which retrocessions were accepted after the limit was reached. The evidence does not support that Sphere Drake would have learned the limit had been exceeded if Broad had performed his duties in a reasonably diligent manner. It

certainly does not support that failure to contemporaneously recognize the limit had been exceeded was due to Broad's gross or culpable negligence.

In early December 1998, WEB requested that Sphere Drake provide irrevocable letters of credit to cover year-end reserve funding requirements under the Unicare Retrocession. At the end of December, Sphere Drake raised issues with Horace Holman going to the requirements of the letters of credit, but also made mention of general issues regarding EIU's actions under the Binding Authority.[17] On January 8, 1999, Sphere Drake sent a fax

---

[17]All American contends that in December 30, 1998 communications with Horace Holman and Stirling Cooke, Sphere Drake addressed the letters of credit issue on its merits without mentioning the general issues, but then Sphere Drake raised the general issues the next day. All American apparently contends the December 30 communications are evidence of Sphere Drake confirming the validity of the Unicare Retrocession. However, the evidence cited by All American shows the December 30 communications also make reference to the general issues. See All American Reply Exh. 64 (December 30, 1998 fax from Sphere Drake to Horace Holman) ("[W]e are, as you know, carrying out our own review of the account that has been written and, in doing so, are trying to evaluate the concerns which I have raised with you over the course of the last few months. This is ongoing. . . . [W]e have started to look through EIU's underwriting files and, although this process will take some time, we are deeply disturbed by what we have seen so far."); id at 65 (Bentley's notes of December 30, 1998 conversation between Sphere Drake's Bentley and Stirling Cooke's Nick Brown) ("The conversation then turned to some of the previous problems regarding [the EIU] account. . . . Nick Brown said he was aware that the senior management of [Sphere Drake] were reviewing the cover. He thought that [Sphere Drake's] actions in recent months were unhelpful and he could not understand our attitude. Nick Brown went on to say he knew the facility may not go forward for 1999 but such a decision would be unbelievable. He again reiterated that EIU were doing an excellent job on [Sphere Drake's] behalf. If only we really understood this account instead of asking some of the ridiculous questions, . . . .").

to Stirling Cooke which stated in part: "To be quite clear, my 'dissatisfaction' relates to the manner in which a binding authority granted by officers of [Sphere Drake] for the purposes of enabling the Coverholder to write a short-tail low to medium risk accident account, has been used to write a book of business which, as far as I can tell, bears no resemblance to that described in the Business Plans and which, quite apart from any of the other concerns which we have raised, seems to consist, in large part, of disastrously underpriced high-risk, long-tail Workers' Compensation business." Sphere Drake Response Exh. 15. Also sent with this fax was a December 31, 1998 fax from Sphere Drake to Horace Holman stating in part: "As you will know, we are carrying out a review of our involvement in this facility and, whilst this is ongoing, we feel that we have to reserve our position in relation to the [letters of credit] requests and generally." Id. Exh. 14. The January 8, 1999 fax also made reference to prior discussions. Evidence is presented showing that a meeting was held on January 4, 1999 that included participants from Sphere Drake, Stirling Cooke, Horace Holman, and EIU.[18] Issues as to claimed deficiencies in EIU's underwriting practices were raised at that meeting and Sphere Drake expressed a desire to be out of all the EIU-accepted

---

[18]The evidence consists of written file notes of the meeting that were written by two of the attendees. See Sphere Drake Response Exh. 16-17; All American Reply Exh. 69. Neither side objects to the use of these file notes as evidence of the discussions that occurred.

retrocessions _ab initio_.  The evidence of the meetings that is
provided supports that there was no issue raised regarding
exceeding the premium limit.  One of the file notes, Sphere Drake
Reply Exh. 17 at SDA2580, shows that reference was made to the
moratorium that was imposed beginning July 1998.

In a February 4, 1999 letter from All American to Sphere
Drake, All American expressly acknowledged that an issue had been
raised regarding EIU's authority to place business on Sphere
Drake's behalf.

On March 31, 1999, Sphere Drake provided written notice
to All American that, _ab initio_, it was rescinding the Unicare
Retrocession, as well as six other EIU-accepted retrocessions in
which All American was the ceding insurer.  Sphere Drake offered
full return of the premium.  The stated grounds were:

> We have been investigating the operation of
> the binding authority, the contracts written
> thereunder and EIU's dealings with brokers
> generally.  These investigations have revealed
> that the placement of each of the Contracts was
> induced by and is vitiated by fraud on the part
> of your agents/brokers and EIU.  Further, the
> nature of the Contracts was such that your
> agents/brokers knew (or ought to have known),
> when placing the business, that EIU was acting in
> clear and deliberate breach of the duties owed to
> [Sphere Drake].

By the end of 1998, Sphere Drake had received through EIU
more than $3,000,000 in Unicare Retrocession premiums.  The
evidence presented by All American does not show when the
payments were forwarded to Sphere Drake.  See All American Exh.
45.  Since the burden of proof is on All American, it will not be

assumed that any of these payments were made in October 1998 or later. There is no conclusive evidence regarding whether or not, in 1998, Sphere Drake would have been able to identify any of the payments received from EIU as representing Unicare Retrocession premiums.

By late January 1999, Sphere Drake had offered to return all premiums. All American rejected that offer.

It is undisputed that, as late as February 1999, Sphere Drake was seeking its own reinsurance for the retrocessions accepted by EIU. It is also undisputed that Sphere Drake did not expect that they would be able to find such reinsurance. Also, Sphere Drake insisted that disclosures about Sphere Drake's problems with EIU be made to any reinsurer.

Clearly, All American cannot be entitled to summary judgment on the issue of ratification. On All American's motion, it must be taken as true that Sphere Drake did not know until March 1999 that the Unicare Retrocession was one of the retrocessions accepted in violation of the premium limit. Thus, Sphere Drake did not have full knowledge of the material facts until shortly before it gave All American formal notice of rescission. Therefore, on All American's summary judgment motion, Sphere Drake cannot be found to have ratified the Unicare Retrocession.

On Sphere Drake's motion, it must be taken as true that Sphere Drake knew by sometime in October 1998 that the Unicare Retrocession was accepted in violation of the premium limit.

Sphere Drake did not provide notice of rescission until more than five months later. However, by early January 1999, Sphere Drake was already informing Stirling Cooke that it was questioning EIU's authority to accept the retrocessions, including the Unicare Retrocession. Even though it can be argued that the communication did not directly raise the excess authority issue, it was an indication of an intent not to affirm the Unicare Retrocession. Moreover, subsequent to October 1998, Sphere Drake was continuing to investigate possible fraud and fiduciary duty violations by EIU, possibly in collusion with Stirling Cooke. Confirmation of those suspicions potentially could have provided grounds for rescinding all the EIU-accepted retrocessions, not just those retrocessions accepted when and after the premium limit was reached.

There is no sufficient evidence that Sphere Drake continued to receive any premium payments after October 1998. The only evidence of possibly inconsistent conduct is retention of prior payments and the attempt to obtain reinsurance coverage. The attempt to obtain reinsurance was another way of avoiding the contracts and Sphere Drake was insisting that disclosure of the EIU problems be made to any potential reinsurer. Seeking reinsurance was not any more consistent with intending to ratify than it was with intending not to ratify.

As to retention of the premiums, it must be taken as true on Sphere Drake's motion that, by October 1998, Sphere Drake could identify premiums received under the Unicare Retrocession.

Sphere Drake first offered to return the premiums in late January 1999 and that offer was rejected by All American. Thus, the evidence, construed in All American's favor, only supports that, prior to offering to return them, Sphere Drake knowingly retained premiums for less than three months after learning the Unicare Retrocession was accepted in violation of the premium limit. Sphere Drake did not receive additional payments; it only continued to retain those it had previously received. Additionally, during those three months, Sphere Drake was also continuing to investigate the EIU-accepted retrocessions, including possible fraud and breaches of fiduciary duty. Throughout the three months, Sphere Drake engaged in discussions with EIU and Stirling Cooke was also included in the discussions beginning no later than January 4, 1999.

Ratification does not occur if the principal fails to return prior payments immediately after obtaining full knowledge regarding the unauthorized contracting. See Schoenberger, 405 N.E.2d at 1082. The principal is only required to take action to repudiate the contract or return benefits within a reasonable period of time after obtaining full knowledge. Progress Printing, 601 N.E.2d at 1067; Mateyka v. Schroeder, 152 Ill. App. 3d 854, 504 N.E.2d 1289, 1295 (5th Dist. 1987); Corn Belt Bank v. Lincoln Savings & Loan Association, 119 Ill. App. 3d 238, 456 N.E.2d 150, 159 (4th Dist. 1983); Security Insurance Co. of Hartford v. Mato, 13 Ill. App. 3d 11, 298 N.E.2d 725, 729-30 (2d Dist. 1973). This includes a reasonable period of time to

investigate pertinent facts.  See <u>Neece v. John Hancock Mutual</u>
<u>Life Insurance Co.</u>, 1989 WL 31004 *2 (N.D. Ill. March 24, 1989),
<u>aff'd by unpublished order</u>, 914 F.2d 260 (7th Cir. 1990);
<u>Southland Corp. v. Mir</u>, 748 F. Supp. 969, 986 (E.D.N.Y. 1990);
<u>Bernstein ex rel. Commissioner of Banking & Insurance of Vt. v.</u>
<u>Centaur Insurance Co.</u>, 644 F. Supp. 1361, 1370 (S.D.N.Y. 1986).
Also, retaining the benefits will not necessarily constitute
ratification if the principal cannot then repudiate the entire
contract without incurring a loss.  <u>Corn Belt</u>, 456 N.E.2d at 159.

Here, Sphere Drake's investigation of possible fraud and
fiduciary duty violations continued even after it could determine
that the Unicare Retrocession was one of the retrocessions
accepted in violation of the premium limit.  The fraud possibly
involved collusion with All American's agents.  A reasonable
finder of fact could not find that Sphere Drake acted
unreasonably by continuing to investigate the fraud for another
few months before first offering to return the premiums.  The
investigation potentially could have revealed liabilities for
which retaining the premiums would be an offset.  On the evidence
before the court, it cannot be found that Sphere Drake failed to
act within a reasonable period of time to repudiate the Unicare
Retrocession and offer to return the premiums.  <u>Cf.</u> <u>Southland</u>
<u>Corp.</u>, 748 F. Supp. at 986.  There is no sufficient basis for
finding that Sphere Drake engaged in conduct that ratified the
unauthorized contract.

All American also raises the related defenses of estoppel
and waiver.  Those defenses fail for reasons identical or similar
to the reasons the ratification defense fails.  All American
bears the burden of proving the elements of estoppel.[19]  Midway,
180 B.R. at 967.  "Estoppel refers to reliance by one party on
the word or conduct of another so that the party changes his
position and subsequently suffers harm.  It arises whenever one
by his conduct, affirmative or negative, intentionally or through
culpable negligence, induces another to believe and have
confidence in certain material facts, and the latter having the
right to do so, relies and acts thereon, and is as a reasonable
and inevitable consequence, misled to his injury."  Id. at 971
(quoting Gary-Wheaton Bank v. Meyer, 130 Ill. App. 3d 87, 473
N.E.2d 548, 554-55 (2d Dist. 1984)).  In order to succeed on its
estoppel defense, one element that All American must show is
detrimental reliance.  See In re Krueger, 192 F.3d 733, 741 (7th
Cir. 1999); Moriarty v. Hills Funeral Home, Ltd., 221 F. Supp. 2d
887, 895 (N.D. Ill. 2002).  All American contends it relied to
its detriment on Sphere Drake's delay in not rescinding the
contract after Sphere Drake was aware it could rescind based on
EIU's violation of the premium limit.  The purported detriment
was paying the premiums and not seeking alternative cover.
However, there is no evidence that further premiums were paid

---

[19]The standard of proof may be one higher than
preponderance of the evidence.  See Midway, 180 B.R. at 968-71.
For present purposes, though, it may be assumed that the
preponderance of the evidence standard applies.

after October 1998.  Therefore, the payment of premiums could not
have been made in reliance on any delay by Sphere Drake.  As to
obtaining cover, All American presents no sufficient evidence
that, as of October 1998, it could have obtained alternative
cover or that its ability to obtain cover decreased between
October 1998 and January 1999 when Sphere Drake offered to return
premiums and void the contract.  Also, even if All American could
satisfy the detrimental reliance requirement, the fact that
Sphere Drake acted within a reasonable period of time to
repudiate and rescind the contract would preclude the application
of estoppel.  Cf. ANR Freight System, Inc. v. Weldbend Corp.,
1993 WL 88086 *4 (N.D. Ill. March 22, 1993).  The evidence before
the court does not support All American's estoppel defense.

        All American also invokes waiver.  Again, the burden of
proof to show waiver is on All American.  See Midway, 180 B.R. at
919.

        A waiver is the intentional relinquishment
        of a known right or such conduct as warrants
        an inference of such relinquishment.  To
        constitute a waiver, it is essential that
        there be [1] an existing right, benefit or
        advantage, [2] knowledge, actual or constructive,
        of its existence, [3] an intention to relinquish
        it, and [4] an indication of the intention to
        relinquish the right by some act.
        Waiver may be express or implied, as a
        necessary consequence of conduct inconsistent
        with an assertion of the retention of a right.

18 Ill. Law & Prac. Estoppel § 21 at 78 (1956).

        In order to establish implied waiver through a party's
conduct, it must be shown that the party "clearly, unequivocally,

- 42 -

and decisively" took action waiving the right.  <u>Midway</u>, 180 B.R.
at 920.  "Waiver of a contractual right is shown only when a
party conducts itself in a manner which is wholly inconsistent
with the clause or condition, thereby indicating its intent to
abandon the contractual right."  <u>Id.</u>

Here, Sphere Drake did not engage in any conduct that
unequivocally indicated an intent to waive its right to repudiate
an unauthorized contract.  Like ratification, waiver cannot occur
until the waiving party first has knowledge of its right.  Sphere
Drake did not know of its ability to rescind the Unicare
Retrocession until October 1998 at the earliest.  It thereafter
continued to investigate related issues for approximately two
months before expressing an intention to repudiate the contract
and less than a month later offered to return the benefits it had
previously received and had continued to retain.  As previously
discussed, Sphere Drake acted in a reasonable and timely manner.
That does not constitute conduct clearly, unequivocally, and
decisively indicating an intent to waive the right to repudiate
the contract.  The evidence before the court does not support All
American's waiver defense.


## VII.  CONCLUSION

All American does not present sufficient evidence to
support any basis for finding that Sphere Drake was bound by the
Unicare Retrocession.  Sphere Drake's summary judgment motion
will be granted and All American's summary judgment motion will

be denied.  Since Sphere Drake was not bound by the Unicare
Retrocession, there is no basis for requiring it to arbitrate any
dispute and All American's pending motion to compel arbitration
will be denied as well.  Sphere Drake II, 256 F.3d at 592; Sphere
Drake IV, 221 F. Supp. 2d at 878.  Because the excess authority
claim is resolved in Sphere Drake's favor, there is no need to
further consider the fiduciary duty claim which will be dismissed
without prejudice.  Sphere Drake II, 221 F. Supp. 2d at 878-79.
Sphere Drake is entitled to a declaratory judgment that the
Unicare Retrocession was void ab initio.  It will be required to
return the Unicare Retrocession premiums paid by All American.
All American's counterclaim causes of action will be dismissed
with prejudice.

IT IS THEREFORE ORDERED that plaintiff's motions to
strike [148, 162] are granted in part and denied in part.
Plaintiff's motion for summary judgment [134] is granted.
Defendant's motions for summary judgment [140] and to compel
arbitration [101] are denied.  The Clerk of the Court is directed
to enter judgment in favor of plaintiff-counterdefendant Sphere
Drake Insurance Limited (f/k/a Odyssey Re (London) Limited) and
against defendant-counterplaintiff All American Life Insurance
Company (n/k/a American General Life Insurance Company)
(a) declaring that the Unicare Retrocession (Registration No. AH
0115198) is void ab initio; (b) ordering that Sphere Drake return
the Unicare Retrocession premiums received by Sphere Drake within
30 days after this judgment becomes final; (c) dismissing

- 44 -

plaintiff's Count II and Count III "fiduciary duty claims" without prejudice; and (d) denying counterdefendant's counterclaim causes of action with prejudice.

ENTER:

_William T. Hart_
UNITED STATES DISTRICT JUDGE

DATED: SEPTEMBER 19 , 2003